HUDSON COUNTY COURT OF COMMON PLEAS.

CHARLES J. ENGELMANN, PETITIONER-APPELLANT, v. HUDSON DISPATCH, A CORPORATION, RESPONDENT-APPELLEE.

Decided July 23, 1947.

For the petitioner-appellant, *Otis & Kilkenny*.

For the respondent-appellee, *Kalisch & Kalisch*.

DREWEN, C. P. J. Petitioner was employed as a linotype machinist in respondent's printing plant. The accident, which occurred December 21st, 1945, is described in the claim petition as follows: "I was changing magazine from machine to place on rack and did not have magazine on rack when I noticed it. I pulled the magazine towards me and when I did, I felt the cross bar strike me in the pit of my stomach and had to have another man complete the change." The resulting injury is alleged to be the rupture of a peptic ulcer, upon which an operation was performed a few hours following the accident, confining petitioner to a hospital for about four and one-half weeks. He returned to his work on April 5th, 1946. Respondent denies accidental injury as alleged and also denies any resultant disability.

The finding in the Bureau was that petitioner failed to prove his claim by a preponderance of the evidence, and the Deputy Commissioner recites as additional support of the

conclusion reached the opportunity he had to observe the several witnesses. Respondent makes the latter feature of the proceeding below a special point of argument here. We do not overlook the application of the principle in general, but in a procedure of trial *de novo* on the record, that is without sight or sound of the witnesses, undiscriminating adherence to it would constitute the first trier also the final judge.

There are definite factors of proof in this record that must be analyzed and appraised. What we regard as the body of established fact from which the occurrence of an accidental injury may be deduced as a reasonable probability is, together with our passing comment thereon, as follows: Petitioner had been in respondent's employ for nineteen years, doing the same kind of work. The task that engaged him at the time of the alleged mishap was one that he performed ordinarily ten or twenty times a night. Notwithstanding a long illness from intestinal ulcers the record reveals no prior loss of time by reason thereof. His hours of employment began at 6:15 P. M. and on the evening in question he had carried on his duties without apparent difficulty of any kind until the accident in question, which occurred about 9:30 P. M. He was then engaged in removing a magazine weighing about 78 pounds from a linotype machine to a rack, carrying or swinging it the intervening distance of five to ten feet. In the immediate juncture of that operation he was heard to utter a profane ejaculation of anguish, at the same time exhibiting in the expression of his face unmistakable evidence of extreme pain. Upon the instant and in response to an inquiry by one who had come to his help petitioner said the magazine had slipped. Respondent complains of the insufficiency of this declaration as evidence of the happening, on the ground that it includes nothing about a striking in the stomach, but it is the brevity of the utterance that gives assurance of its spontaneity, an essential criterion of *res gestæ*. Petitioner's testimony in this connection is "I felt the magazine slip * * * and pulled it toward my stomach, and the part that extends about a half inch to an inch on each side where that hook catches this magazine, that is what hit me in the stomach;" and the Deputy Commissioner notes on the record that petitioner "makes a sudden gesture of

coming down and bends over and rapidly grabs with his hand towards his stomach." We see no divergence between the contemporaneous utterance and this testimony; the only thing added by way of amplification is the telling of what it was that the slipping caused to happen and how. The failure to tell these details in the immediate juncture of the event should be clearly understandable on plainly natural grounds. A co-worker came to petitioner's assistance to the extent at least of placing the magazine on, or of shoving it back into, the rack. He says "After I pushed him out of the way I took over." Petitioner testifies that when he was struck "I felt that terrific pain  *  *  *  I sat down and doubled up." This pain was unlike anything he had previously felt in what may be called the normal course of his illness. The accident occurred, as stated, about 9:30 P. M., and five minutes thereafter petitioner reported it, he says, to his foreman and asked permission to go home, which was not then given. Throughout the remainder of the night petitioner continued to be disabled, except for a minor repair job he was asked to do and which he made special effort to perform. At 10:40 P. M. he vomited and saw evidences of blood. This also he reported to the foreman and again asked for permission to leave, which was again denied, at least in part for the reason soon to be noted. These reportings by petitioner the foreman admits, save that he denies there was mention of an "accident" in the first report, and as to the mention of blood in the report of the vomiting, he says he may have forgotten that detail though he does not think so. The foreman does, however, describe the petitioner's appearance on the occasions when the latter spoke to him as "terrible;" and he feared petitioner would collapse in the street if permitted to leave for home. From the foreman's testimony that prior to petitioner's first report the latter had been doing his work in the usual way we infer that the foreman, while thus observing petitioner, had not noticed any arresting aspect of illness, and we find nothing to explain the suddenness of its startling appearance apart from the consequences of the mishap with the magazine. A relation between the two is, in our judgment, fairly probable at least. At about 1:30 A. M. petitioner was sent home with a co-worker who

had been assigned to accompany him. The two were on the street a short distance from the plant when petitioner collapsed. He was taken to the hospital and the operation performed soon after his arrival. It disclosed a three-quarter inch ulcerous perforation of the duodenum. Supplementing the foregoing is the testimony of Dr. Pentel, called by respondent, that the vomiting of blood after a blow like that described would be "some indication" of a perforation; the testimony of respondent's expert that intense pain is a concomitant of perforation and bloody vomit another; and the latter's further testimony that there can be a causal relation between a traumatic happening and a perforated ulcer.

From all of this it must, in our opinion, be recognized that in his lifting and removing of the magazine petitioner sustained the injury complained of. What respondent questions is the real cause of the injury. Was it a crisis entirely within the illness itself, or was there an accident-related inducement? For one thing, there is the definite circumstantial evidence of sequence, a *prima facie* indicia of cause and effect that may be taken as a factor of proof when nothing else stands in repugnance to it. Undoubtedly petitioner's condition of health was such as to predispose him to an injury of the kind he sustained and in the manner he sustained it. But however cogent may be the idea that the ulcer was bound to rupture in any case, we cannot give effect to it without indulging in forbidden speculation. Were it not for the trauma the rupture would not have occurred when and as it did, and thus it is that present requirements of the law for the showing of inducing cause are satisfied.

Addressed to this question of causal relation is the testimony of the physicians. Respondent's expert says the rupture was not caused by and did not occur with the happening of the accident, but that it occurred when petitioner collapsed on the street. Of course, certainty here is neither necessary nor possible. More especially so where the requiremnts of proof are dependent upon the pronouncements of experts made in the way of theory and opinion upon the latent behavior of internal disease. It is the view of Dr. Olcott, for respondent, that a perforation like that revealed by the surgery in the case would necessarily have precipitated an imme-

diate and "dramatic" episode. The patient would have been completely disabled at once. As already noted, his testimony is that the rupture occurred at the time of collapse on the street and not before, and that there were no antecedent progressive phases between the rupture as ultimately revealed and a generating factor in the accident itself. He expounded at length upon two extremities, "pinpoint" leakage and the "massive" rupture that was actually found. He mentioned no intermediate condition. According to the Olcott thesis, the only degree of intestinal leakage that would have made it possible for petitioner to stand on his feet and move about to the extent that he did following the accident is "pinpoint" leakage, but petitioner's case was never one of "pinpoint" leakage, he says, because the operation disclosed the massive hole, and pinpoint never develops into a rupture of that kind, certainly not within the interval between the accident and the collapse. The important thing to note is that since Dr. Olcott rejects or ignores any and all conditions between the extremes of "pinpoint" and "massive" and ascribes to these the disparate symptoms he does, his thesis completely excludes all theory of delayed reaction or progression of injury as between the trauma and the collapse. Nevertheless, that is the theory we believe to be inherently the determining medical question in this case, and while Dr. Olcott does not deal with it, except as we shall notice later, it is dealt with by both Dr. Flanagan and Dr. Schulman for petitioner.

That the extremity of the patient's state is not due to the size of the rupture in and of itself but to the consequent spilling of intestinal content into the abdominal cavity, we get from the testimony of the same Dr. Olcott where he deals with the "slow leakage" from a pinpoint perforation. What Dr. Flanagan says is that the symptoms depend on the size of the perforation plus the contents in the stomach at the time, that in case of a full meal the symptoms would be more pronounced than when the stomach is empty. Incidentally, the evidence shows that petitioner ate nothing during that night and the preceding evening, and drank only water or milk.

When confronted on cross-examination with the problem of delayed reaction and the related matter of increasing

leakage from an increasing rupture, Dr. Olcott still excluded any intermediate or expanding stage. But we come explicitly to the question in the testimony of Dr. Schulman, the operating surgeon. Counsel for respondent in his cross-examination of this witness, and apparently anticipating the theory then still to be expounded by his expert Dr. Olcott, sought to show by Dr. Schulman that he found free fluid in the abdomen and that with a perforation of the size here disclosed the effect on the patient is very great. The response elicited was "Yes, but with one exception. The actual perforation, when it first began, might have been very, very much smaller than actually shown here. The effect on an individual is only when the fluid gets out of the intestine into the abdominal cavity. Then he begins to show all the symptoms of rigidity and shock, which isn't inconsistent, from the time it happened until the time he was admitted." And this testimony the witness insisted was not hypothetical but expressive of "actually what happened," and of "only what I found." And having in mind specifically the time lapse from 9:30 P. M. until 1:30 A. M., the witness speaks of that as "the explanation for this." We should notice here petitioner's testimony that as he walked from the bench to do the minor job at about 1:30 he "felt as though something was leaving my stomach."

Implicit in the foregoing testimony of Dr. Schulman is the proposition that a spread of the perforation is not unlikely and that when it occurs leakage increases, that it is such increase which explains the delayed reaction in the present instance, and that the doctor's pronouncements in this regard are consistent with what actually occurred here and with what he found.

There is one thing more. Respondent contends that petitioner is chargeable with certain claimed admissions against interest appearing in what purports to be a medical history in the hospital record. By a somewhat indirect method, over objection and without specific proof that petitioner gave a medical history, respondent's counsel elicited from Dr. Schulman the recital of certain statements taken to be a record of information given the doctors by the patient. These statements as read into the testimony are "pain in epigastrium

which would be relieved by either alkalis or vomiting; was under treatment for ulcers of the duodenum diagnosed under fluroscope, and for past two weeks has been having daily pain and at night it was steady and very sharp in the epigastrium and whole abdomen. Hematemesis (blood vomiting)." Dr. Schulman testified that the condition thus indicated is more or less typical of cases of the kind, and we find nothing in the recited matter which under all the surrounding facts and circumstances contravenes the precipitation by the accident of the crisis that occurred on the night in question. As to the hematemesis, it is impossible to tell whether the reference is to repeated experiences of the kind or only to the occurrence that followed the mishap.

Respondent makes a point also of Dr. Pantel's assertion that petitioner did not tell him anything about a trauma. That assertion by the witness is all there is. It appears in the record as a gratuitous, quite unresponsive answer to a question relating to causality. We would surely have to know more than the transcript tells to give the assertion the importance respondent asks. The so-called hospital record itself did not go into evidence,

This court finds that the accident and injury are evidentially established. As to disability and award, however, there are difficulties. It may be that more proof should be taken, either here or on a remanding to the Bureau for that purpose. The question of disability and award should also have further argument. Counsel will be heard on notice.